**In the Matter of William E. CRAWFORD and Clara V. Crawford, Debtors.**

**UNITED STATES of America, Plaintiff,**

v.

**William E. CRAWFORD and Clara V. Crawford, Defendants.**

**Bankruptcy Nos. 79 B 4942, 79 B 4943.**

United States Bankruptcy Court,
N. D. Illinois, E. D.

Feb. 4, 1980.

Melvin J. Kaplan, Chicago, Ill., for debtors.

Thomas P. Sullivan, U. S. Atty., Kevin J. Egan, Asst. U. S. Atty., Chicago, Ill., for plaintiff.

## OPINION AND ORDER

RICHARD L. MERRICK, Bankruptcy Judge.

This cause comes on to be heard upon the complaint of the mortgagee[1] under Bankruptcy Rule 13–401(d) for a dissolution of the stay provided by Rule 13–401(a). The present posture of the proceedings is that it is being considered by the Court upon the plaintiff's motion for summary judgment.

In opposition to the motion the defendants have contended that Rule 56 of the Federal Rules of Civil Procedure places a burden upon the moving party to establish that there are no genuine issues of fact. As a matter of precision the applicable rule is Bankruptcy Rule 756, which adopts Federal Rule 56, subsection (c) of which provides in pertinent part:

> "The judgment shall be rendered forthwith if the pleadings . . . show that there is no genuine issue as to any material fact",

which is the affirmative method of stating that a judgment shall not be rendered if there is a genuine issue as to a material fact.

The defendants urge that the moving party has the burden of establishing that there is no factual issue in dispute, but that type argument of itself raises the philosophical question of the difficulty of establishing a negative. The mere filing of a motion for summary judgment is an assertion by the moving party that there is no genuine issue of material fact; the next move becomes that of the adverse party. If there should be a genuine issue, it is a simple matter for the adverse party to demonstrate the nature of the dispute. He only has to identify it and has no present obligation of substantiation.

The answer of the defendants consists in part of a general denial and in part of special defenses. The general denial aspect will be discussed first as it is affected by Bankruptcy Rules 708 and 911. Rule 708 adopts Federal Rule 8 except that it eliminates the necessity of stating grounds of jurisdiction. Rule 911 is an adaptation of Federal Rule 11. The principal factual allegations of the complaint are:

1. The existence of a mortgage—admitted;

---

1. The mortgage was issued on April 19, 1974 to Illinois Savings and Loan Association. After default the mortgage was assigned to Federal Home Loan Association. At the foreclosure sale the mortgage was bid in by Federal Home Loan Mortgage Corporation and subsequently assigned to The Administrator of Veterans Affairs, who will be referred to herein as the "mortgagee".

2. Allegation of default and foreclosure—general denial in spite of the fact that a copy of the foreclosure complaint is attached as an exhibit to the complaint;

3. Allegation of decree of foreclosure and sheriff's sale—general denial in spite of the fact that a copy of the foreclosure decree is attached as an exhibit to the complaint;

4. Allegation that the state court approved the sheriff's sale—general denial in spite of the fact that a copy of the order is attached as an exhibit to the complaint;

5. Identification of purchaser at foreclosure sale—general denial;

6. Identification of transferee from purchaser—general denial.

The general denial of paragraphs 5 and 6 is in spite the fact that there is attached to the complaint as an exhibit an assignment of the property at issue from Federal Home Loan Mortgage Corporation to the Administrator of Veteran Affairs. Bankruptcy Rules 708 and 911 parallel Federal Rules 8 and 11 in establishing specific denials as the norm but in permitting a general denial where a signed pleading is the attorney's certificate that to the best of his knowledge, information and belief there is good ground to support it and that it is not interposed for delay. The attorney for the defendants signed the answer, and we can only feel that for him to "demand strict proof" of the allegations supported by exhibits was for the purposes of delay.

■ A general denial is appropriate only where the pleader intends in good faith to controvert the preceding pleading. *Reed v. Turner*[2]; *United States v. Long*[3]; *In re William A. Early*[4]. The proposition was well stated in *American Photocopy Equipment Co. v. Rovico, Inc.*[5],

"We hold that . . . this failure of plaintiff to frankly reply on a matter, which it . . . must have had within its knowledge, exhibits a lack of fairness which completely discredits its statement that it is without knowledge of or information sufficient to form a belief as to the truth of said averment . . . ."

"We disagree and hold that plaintiff has not in effect denied the aforesaid averment of defendant. Rule 8(b) affords no shelter of plaintiff, in view of the facts . . . ."

In speaking of a National Labor Relations Board rule similar to Federal Rule 8, the Ninth Circuit said in *Harvey Aluminum Inc. v. National Labor Relations Board*[6],

"Under a comparable provision of the Federal Rules of Civil Procedure, an answer asserting want of knowledge sufficient to form a belief as to the truth of facts alleged in a complaint does not serve as a denial if the assertion of ignorance is obviously sham. In such circumstances the facts alleged in the complaint stand admitted."

■ During the past several years this Court has administered in excess of 6,000 Chapter XIII cases, in at least 1,000 of which Melvin J. Kaplan, the attorney for the debtors herein, was attorney for the debtor. This Court will take judicial notice of the fact that in this district Kaplan is the only "regular filer", as they are termed in the practice, who will accept wage earner cases after foreclosure and sale of the debtor's residence has been approved by an order of the Circuit Court of Cook County. It is inconceivable that when he accepted this case Kaplan was not aware of the circumstances surrounding the debtors' residence. For example, in the schedule of creditors Federal Home Loan Mortgage Corporation, at the address of its attorneys, followed by the number of the foreclosure proceeding, 78 CH 3200, is listed as being owed $17,143.24, of which $4,067.34 is listed as "mortgage arrears 12/77 to 5/31/79."

**2.** D.C.Pa.1941, 2 F.R.D. 12.

**3.** D.C.Neb.1950, 10 F.R.D. 443.

**4.** 1 Bankr.Ct. Dec. 1675 (S.D.N.Y.1975).

**5.** 359 F.2d 745, 746, 747 (7 Cir. 1966).

**6.** 335 F.2d 749, 758 (9 Cir. 1964).

The Court finds that the general denial of paragraphs 2–7, inclusive, of the complaint constitutes a sham that was interposed solely for the purpose of delay and to cause the complainant to undertake unnecessary expense. On its own motion the Court strikes the answers to paragraphs 2–7 inclusive, of the complaint and holds that the allegations contained in those paragraphs are admitted.

Paragraphs 12–15, inclusive, of the complaint also are denied generally but the denials to some extent are accompanied by special defenses, which merely will be outlined at this juncture.

Paragraph 12 alleges that the debtors have little or no equity in the property; a special defense contends that there is substantial equity. As will be explained more fully below, the debtors no longer have an ownership interest in the property, so that it is immaterial whether or not there is an equity.

Paragraph 13 alleges that there is no justification for debtors' continued possession, to which there is a general denial. The paragraph states a legal conclusion, so that the denial does not raise a genuine issue of material fact.

Paragraph 14 alleges that the equity of the debtors in the property has been extinguished, to which there is a general denial and a special defense. Here again the paragraph states a legal conclusion, so that its denial does not raise an issue of material fact.

Paragraph 15 states that the property is not necessary to the completion of the plan, to which there is a general denial and a special denial. Here also the paragraph states a legal conclusion, so that the denial does not raise an issue of material fact.

The special denials referred to above do not plead specific facts which controvert the allegations of the complaint but are general assertions which are little more than stating affirmatively what had been denied generally. As such they do not bring any material facts into issue.

The crux of the instant case, and of all other Chapter XIII cases with which this Court is familiar where the petition has been filed after a state court order approving a sheriff's sale, is to determine what interest, if any, the debtor has in the property. Under some circumstances this might be a combined question of law and of fact. The first phase would consist of determining as a theoretical legal matter whether the debtor had any property rights. If a positive answer should be obtained as to the first phase, the second phase would be a factual question of valuation to determine what would be the worth of any rights which might exist. As will be described more fully below, we do not get to the second phase in the instant case because as a matter of law the debtors do not have any rights in the property at issue. (For the purposes of this decision we will ignore that under local law a debtor may not be dispossessed except by consent or prescribed statutory procedures. Those rights to a peaceful existence are more in the nature of civil rights than property rights).

A century old analysis of mortgage law is as true today as it was then,

> "There is, perhaps no species of ownership known to the law which is more complex, or which has given rise to more diversity of opinion, and even conflict in decisions, than that which has sprung from the mortgage of real property."[7]

In Illinois, as in other jurisdictions which are a part of the Anglo-American tradition, mortgage law is not so much a matter of logic as it is of history. A brief review of the historical development of mortgage law should bring the issues of the instant case into an understandable focus.

From about 1350 until the present time in England, and throughout the nineteenth century in most of the United States, the customary method of creating a real estate mortgage was by an absolute deed of conveyance of the fee, subject to defeasance upon timely payment of the debt secured. Why an absolute conveyance should be used

---

7. *Barrett v. Hinckley*, 124 Ill. 32, 41, 14 N.E. 863, 865 (1888).

in a conditional transaction has been the subject of considerable discussion over the years. The explanation which best fits all known facts is that this method is derived from the form which Jewish mortgages took in England and on the Continent in the eleventh and twelfth centuries, itself dictated by the doctrine of "Asmakhta", which made conditional transfers invalid under Talmudic law.[8] To circumvent the prohibition against conditional transfers the Jews had adopted a device by which the borrower made an outright conveyance of the security to the lender, and the lender made an outright reconveyance to the borrower. Both deeds were held by a stakeholder until maturity, at which time the latter would deliver both deeds to the borrower if the loan had been repaid and both deeds to the lender if the debt had not been paid. The conditional nature of the transaction was not apparent on the face of the deeds.

During most of the twelfth and thirteenth centuries the Jews were the financiers of the Christians because of the ecclesiastical laws, and temporal laws to a lesser extent, that prohibited the Christians from charging interest on loans. In lending to Christians the Jews used the same security devices which they had established for their dealings among themselves. After the banishment of Jews from England in 1290 the same basic conveyance and reconveyance procedure continued[9], although from an outright conveyance by the borrower and a separate outright reconveyance by the lender the form of the transaction changed gradually. By 1400 it was common to have the conveyance by the borrower on the face of the document and the reconveyance by the lender on the reverse. By 1450 both the conveyance and the defeasance were on the face of the document, and by 1500 both the conveyance and the defeasance were made by the borrower.

Beginning with South Carolina in 1791 many of the American states started to recognize the true nature of a mortgage as being a security interest and to disregard the form of the instrument. Thus it was that by the end of the first World War the law in about one-half of the states was that title to the property would not pass to the mortgagee even though an absolute deed had been the method of establishing the security. The text writers[10] refer to these states as "lien" theory states, or equity states. About one-third of the states have continued, to a degree, to recognize the form of the document, as transferring ownership, at least as between the mortgagor and the mortgagee; Illinois is one of these states referred to as "title" theory states, or common law states.

It is implicit in the division between "lien" theory states and "title" theory states that the form of the mortgage document is a deed. In the instant case the form of the document was a mortgage and not a deed. Consequently, even though Illinois is a "title" theory state, the mortgagee would not have become the owner because the title was not conveyed to him, in substance or in form.

At least from the fourteenth century onward, the mortgagee as owner of the property might maintain an action for ejectment forthwith or at any subsequent time. That apparently continues to be the law is some of the "title" theory states, but in Illinois and several other states the mortgagee may not maintain a possessory action until after default. For that reason Kratovil[11] and some other writers classify Illi-

8. Jacob J. Rabinowitz, *The Common Law Mortgage and The Conditional Bond*, 92 U. of Pa.L. Rev. 179–194 (1943).

9. A second method also commonly used in the thirteenth century was to have the conveyance described and recorded in the Jewish Exchequer. The Jewish Exchequer was terminated with the expulsion of Jews from England.

10. Pomeroy, *Equity Jurisprudence*, §§ 1187, 1188, 5th Ed. Bancroft Whitney Company (1949); Jones, *Jones on Mortgages*, §§ 18–68, 8th Ed. Bobbs-Merrill Company (1928); William F. Walsh, *Development of Title and Lien Theories of Mortgages*, 9 N.Y.U.L.Q. Rev. 280–309 at 303 (1932).

11. Kratovil, *Real Estate Law*, § 407, 6th Ed. Prentice Hall, Inc. (1964); Kratovil, *Modern*

nois, New Jersey, Delaware and North Carolina as "intermediate" states; that is, they are like "title" states with respect to ownership but "lien" states with respect to possession under circumstances where the confrontation is between the mortgagor and mortgagee.

As early as the twelfth century the English law courts under special circumstances would permit a mortgagor to redeem the property after default upon payment of the principal due. The redemption procedure in the law courts was discontinued during the reign of Edward I and apparently was not used anywhere until the reign of Henry VI, when the Chancellor began to act upon prayers for relief based upon fraud or hardship and would authorize redemption after maturity upon payment of the principal due.[12] In time these matters were delegated by the Chancellor to Courts of Chancery, to the extent that by 1625 the relief had become standardized and it was no longer necessary to plead special circumstances in order to be awarded a right of redemption. In time a counter-balancing of equities caused the Chancery Courts to adopt the principle of foreclosure, so that the right of redemption would not encumber the land indefinitely. The foreclosure proceeding was somewhat similar to a strict foreclosure in that it did not require a sale of the property nor establish a deficiency or liability therefor but merely terminated the interest of the mortgagor.

■ In Illinois, as is true generally, foreclosure is governed by statute.[13] In Illinois special circumstances may create special redemption periods, but the basic underlying redemption period is twelve months after service of summons of the foreclosure proceeding. The period of time running from the date of default until approval of the foreclosure sale is considered a redemption period, and the right by the mortgagor to repurchase the property is referred to as an "equity of redemption."[14] The period of time commencing with the approval of the foreclosure sale and extending to a date set by the order approving the sale, ordinarily three to nine months, is a second redemption period, and the right of the mortgagor to repurchase the property is referred to as a "statutory right of redemption." What the redemption rights are called is not significant, so long as one recognizes the concepts applicable to each, the basic difference in Illinois being that the equity of redemption is indeterminate whereas the statutory right of redemption is of a specified duration.

■ In contrast with early foreclosure which merely terminated the equity of redemption, modern foreclosure assembles all of the outstanding security interests and other encumbrances to clear title and by payment of their respective values relative to each other and to the overall value of the property permits the mortgagee to obtain clear title to the land subject to the statutory right of redemption. The mortgagee, after the foreclosure decree, owns all legal rights and all equitable rights, subject to divestiture upon receipt of the principal of the secured debt, interest and costs. In Illinois the decree approving the sheriff's sale establishes the expiration date of the statutory right of redemption. After the expiration date the former owner has no rights in the property (other than the right

---

*Mortgage Law and Practice*, § 294 Prentice Hall, Inc. (1977).

**12.** The charging of interest first became lawful in 1545, 7 Hen. VIII, c. 9 (1545). It is not known when the Courts of Chancery began to require the defaulting mortgagor to pay interest and costs as well as principal. The statute permitting redemption in courts of law, 7 Geo. III, c. 20 (1734), provided for payment of principal, interest and costs but was little used because of difficulties of proof resulting from the parol evidence rule.

**13.** 1977 Ill.Rev.Stat. Ch. 95, Mortgage Foreclosures; Ch. 77, Secs. 18–28 Redemptions.

**14.** It was first described as an "equity of redemption" in *Duchess of Hamilton v. Countess of Dirlton*, 1 Ch.R. 165 (1654).

In the Jewish mortgages of the thirteenth century redemption had been permitted within one year and one day.

to be removed peacefully). In the absence of fraud, error or some equitable ground which might permit him a third chance, the mortgagor's property rights are ended.

■ The first of the defendants' special defenses is the conclusion ". . . that there is considerable equity in the property", which is merely an affirmative statement that contradicts the allegation of paragraph 12 of the complaint that there is little or no equity. The term "equity" in bankruptcy parlance ordinarily means the total value of property less any outstanding security interests or other liens or encumbrances. For the sake of the argument we may assume that the value of the property does exceed the secured indebtedness and that there is an "equity". Even so, that fact would be irrelevant to this proceeding. The equity is owned by the purchaser at the foreclosure sale, or by his assignee or transferee. The fact of an equity would have no bearing on this proceeding because it would be the equity of the mortgagee. It is not a property right of the defendants with which this Court can deal.

■ Phase I of the second of the defendants' special defenses is another conclusion, ". . . that the security of the mortgage is no way impaired . . ." That assertion has no substance because there is no longer a mortgage to be secured. The debt was extinguished when the mortgage was bid in at the foreclosure sale, and ownership in the mortgagee became absolute with the termination of the period of redemption.

Phase II of the same special defense is that ". . . the debtor maintains a considerable equity in the real estate . ." as stated above, if there is an equity it is that of the present owner of the premises. After the foreclosure sale was approved, the mortgagors had a right to possession of the property during the redemption period, and a right to purchase the property by payment of the principal, interest and costs during the redemption period, and a right to sell the right of redemption during the redemption period. At the end of the redemption period, the mortgagors continued to be the owners of record pending issuance of the sheriff's deed, but they had no property rights with which they could deal.

■ The third of the defendants' special defenses is not correct factually, ". . . that the property is necessary in order to complete the Chapter XIII plan . . ." This is residential property and not income producing property, so that the ownership of it has no bearing on the Chapter XIII plan as a legal matter, unless one takes the position that the debtors may live there rent free and that elsewhere they would have to pay rent. That kind of theory, however, sets bankruptcy law apart from other branches of the law, including the Fifth Amendment to the Constitution. Even though it might be necessary in order to permit a debtor to rehabilitate himself, bankruptcy law does not permit a debtor to use another's property without compensation. In the instant case it is the debtors' plan to continue to live in the house without payment and to accumulate sufficient funds over a period of time to enable the debt to be repaid with interest and payments of the mortgagee's attorney's fees in the foreclosure case. The Court considers it unnecessary to cite cases under the Fifth Amendment to show why two to three years use of the property without payment of rent will be deprivation of property without due process of law.

The preceding paragraphs demonstrate the flaw in the fourth of the defendants' special defenses of having a method by which the property can be redeemed within the life of the plan. The method does not include interim payments for the use of the property during the accumulation period. It is an implied but essential ingredient to the defendants' theory that this Court has the authority to extend the Illinois redemption period from one year to approximately four years. It is not necessary to determine whether or not the Court has that authority because this Court is convinced that an extension of that nature would be a clear abuse of its discretion, even if rent were being paid in the interim.

For most of this century Illinois has been the most expensive or one of the most expensive states in which to obtain mortgage foreclosure. Illinois also has been the slowest or one of the slowest states in completion of a foreclosure, measured from service of summons to issuance of sheriff's deed.[15] Economists have argued for years that the added expense to mortgagees in doing business in Illinois is passed along to the mortgagors as higher costs and that it would be beneficial to Illinois mortgagors to have shorter, less expensive mortgage foreclosure procedures. The Illinois legislature enacted legislation in 1961 which changed mortgage foreclosure procedures in a number of respects but among the most important was a shortening of the statutory redemption period.[16] The legislature had the ability to collect and analyze data and to hold hearings, which this Court does not have. More importantly, however, the legislature is the appropriate place for public policy to be defined because the legislature is an elected body more directly attuned to the views and wishes of the general population. This Court will not deliberately extend a redemption period when it knows that as a public policy declaration the legislature is moving in the opposite direction.

Bankruptcy Rule 756 provides that a motion for summary judgment is appropriate where there are no genuine issues of material fact. With respect to the allegations of Paragraphs 2–7 of the complaint, the Court has stricken the answers as a sham and holds that they are admitted. Paragraphs 8–11 of the complaint are admitted expressly. Paragraphs 12–15 are met with a general denial and with special defenses which do not contain allegations of specific fact but merely present general legal conclusions and assertions. Paragraph 16 is admitted. As a consequence of the foregoing there is not need for the introduction of evidence and the case may be decided upon the pleadings.

To call the Bankruptcy Court a court of equity and to argue from that premise that the Court has virtually unlimited power to promote rehabilitation of debtors is to ignore the statutory structure of the court. A bankruptcy court has only the prescribed powers of existing bankruptcy statutes plus the powers necessarily implied to permit it to carry out the enumerated powers. It does not have the breadth of either Courts of Chancery or courts of law. It has greater flexibility than was allowed to courts of law under common law pleading but that freedom of action is within a smaller sphere of jurisdiction.

The only case cited by the defendant in support of its position is the *Hallenbeck case*[17], which contains strong support for a different proposition. In that case the right of redemption had not expired, but more importantly, a foreclosure proceeding had not even been commenced at the time that the Chapter XIII petition was filed.

Historically all courts have looked with disfavor upon forfeitures, and it is in that light that we view the facts in the instant case. It is unfortunate that the debtors did not take steps to sell their interest in the property while they still had an interest which they might sell. That was a business judgment decision which they made. They have had free occupancy of the property for the seven months since the redemption period expired, and they continue to have a practical leverage because of the nuisance value which resistance to foreclosure carries with it.

The customary tests which are applied by bankruptcy courts in determining

---

**15.** Merrick and Bufithis, *Chapter XII—Why Is It?*, 52 Am.Bank.L.J. 213–257 at 229–230 (1978); D. Bridewell, *The Need for Foreclosure Reform in Illinois*, 6 J.Mar.L.Q. 214 (1940); D. Bridewell, *The Effects of Defective Mortgage Laws on Home Financing*, 5 Law and Contemp. Prob. 545 (1938).

**16.** Frank C. Bernard, *Legal Aspects of 1961 Mortgage and Redemption Law Legislation in Illinois*, 43 Chi.Bar.Rec. 225, 232–235 (1962); R. Kratovil, *Mortgages—Problems in Possession, Rents and Mortgage Liability*, 11 De Paul L.Rev. 1–26 (1961).

**17.** *Hallenbeck v. Penn Mutual Life Insurance Company*, 323 F.2d 566 (4th Cir. 1963).

whether or not a stay should be continued in a rehabilitation case are good faith on the part of the debtor, feasibility of the plan, a debtor's equity in the secured property and the absence of an unreasonable delay in payment of the past due debt, *In re Cassidy*.[18] We question whether the debtors are acting in good faith where they have not made any mortgage payments for two years, but aside from that we find that a further wait for three years in addition to the two years which have elapsed already is an unreasonable delay. It would appear that the payment schedule can be kept, so in that respect the plan is feasible, but the critical factor is that the debtors do not have an equity in the property because it is owned by the mortgagee.

Since December 19, 1978 no mortgage has existed on the premises at issue. This Court cannot, and would not if it could, enter an order which would allow the debtors three years to accumulate funds to finance the repurchase of the house and then compel the mortgagee in 1982 or 1983 to reinstitute a mortgage which was executed April 19, 1974 and terminated December 19, 1978.

It is ordered that the stay of the foreclosure proceeding be removed thirty days after the mailing of this order to the parties.

---

**18.** *In re Cassidy*, 401 F.Supp. 757 (E.D.N.Y.1975).